## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE VIRTUAL
CURRENTLY ASSOCIATED WITH THE
FOLLOWING VIRTUAL CURRENCY
ADDRESS:

**Ethereum blockchain addresses:**
- **0x9dEf8559C00D290b8eae92b6dF0CD9166bb3D918**
- **0x6a24cdC7858d912B3B30356B4DBb5a64270FbD76**
- **0x59Be4b92855cdF6e46C33e6A30959898A44705Db**
- **0x73CD55B6dbf09Efb6B2743020CeDD3F0751c3d1B**
- **0x8E6b5D4Eb68829F95484715A7C429db5a4Eee672**
- **0x8B7Eb22507671F441C9cab6be3FB0c3DfB03Eab5**
- **0x0950b773c38e9dAbA77918101E07622aC4e1DB26**
- **0x7b6A4E83Aa602dD629e2e5518F37540b42C6975B**
- **0x7FF9BBeD32fB217aaA79c0E95b02fb2ccAE07e13**
- **0x13Ff95f4C2BD554835b80C795c5B0b8297666885**

✓ FILED ___ ENTERED
___ LOGGED _____ RECEIVED

1:28 pm, May 01 2026
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____R.C._____ Deputy

**Case No.** 1:26-mj-0637-CDA

### AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Aaron Capitel, being duly sworn, depose and state:

### INTRODUCTION AND AGENT'S BACKGROUND

1. I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses. This

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and does not set forth all my knowledge about this matter.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2021. I am currently assigned to a squad in the Baltimore Division responsible for investigating complex financial crimes such as mail fraud, wire fraud, bank fraud, and money laundering. I have prepared and executed multiple search, seizure, and arrest warrants. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4. This affidavit is made in support of an application for warrants authorizing the seizure of the USDT tokens associated with the following virtual currency addresses (Collectively referred to as the "Target Addresses"):

- **0x9dEf8559C00D290b8eae92b6dF0CD9166bb3D918 (Target Address 1)**

- **0x6a24cdC7858d912B3B30356B4DBb5a64270FbD76 (Target Address 2)**

- **0x59Be4b92855cdF6e46C33e6A30959898A44705Db (Target Address 3)**

- **0x73CD55B6dbf09Efb6B2743020CeDD3F0751c3d1B (Target Address 4)**

- **0x8E6b5D4Eb68829F95484715A7C429db5a4Eee672 (Target Address 5)**

- **0x8B7Eb22507671F441C9cab6be3FB0c3DfB03Eab5 (Target Address 6)**

- **0x0950b773c38e9dAbA77918101E07622aC4e1DB26 (Target Address 7)**

- **0x7b6A4E83Aa602dD629e2e5518F37540b42C6975B (Target Address 8)**

- **0x7FF9BBeD32fB217aaA79c0E95b02fb2ccAE07e13 (Target Address 9)**

- **0x13Ff95f4C2BD554835b80C795c5B0b8297666885 (Target Address 10)**

5.     Each of the tokens in the above addresses are believed to be proceeds of or involved in violations of federal law, including 18 U.S.C. §§ 1343 (wire fraud) and 1956(a)(1)(B)(i) (money laundering), respectively, and therefore subject to criminal and civil forfeiture.

## APPLICABLE LAW

6.     This Court has jurisdiction to issue the requested warrants to seize the funds associated with the **Target Addresses** because they are proceeds of wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349, and/or involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and as such is subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a)(1) (criminal forfeiture), and 18 U.S.C. § 981(a)(1) and (C) (civil forfeiture).

7.     Title 18, United States Code, Section 1343 (wire fraud)  provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," shall be guilty of a federal offense. Title 18, United States Code, Section 1349 criminalizes attempt and conspiracy to commit wire fraud.

8.     Title 18, United States Code, Section 1956(a)(1)(B)(i) (laundering of monetary instruments with intent to conceal) provides that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified

unlawful activity" shall be guilty of a federal offense. Wire fraud is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1).

9.     The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that "if a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain a forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

10.     Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which includes the actual property laundered and property used to facilitate the laundering offense. *See United States v. McKinney*, No. 07-0113-01 (RBW), 2009 WL 10701319 at *7 (D.D.C. Mar. 26, 2009) ("property that may be used to facilitate a money laundering violation includes money in financial accounts, personal property, real property, and businesses"); *see also United States v. Wyly,* 193 F.3d 289, 302 (5th Cir. 1999) (explaining that

untainted funds that are comingled with tainted funds derived from illicit sources may constitute a facilitating property).

11.    This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could otherwise be placed beyond the government's reach. Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement," if there is probable cause to believe that the property is subject to forfeiture. Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located in a foreign jurisdiction. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## PROBABLE CAUSE

### Background on Relevant Cryptocurrency Entities and Concepts

#### Cryptocurrencies and Transaction Analysis

12.    Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and

receive cryptocurrency.    Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency.  A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user.  Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet.  The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions.  Secret keys are typically only shared with the owner of the address.

13.    Cryptocurrency transactions can have multiple inputs and multiple outputs.  While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency.  Blockchains in this context are viewable by the public; they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

14.    Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money.  In my training, knowledge, and experience, fraudsters often use cryptocurrency exchanges to launder or obfuscate their illicit gains.

15.    Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals.  I also know that this shared use of information is frequently actually the same subject accessing the information under different identifiers, or a trusted group working in concert.

16.     Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that cryptocurrency can be laundered through multiple wallets and addresses in a manner similar to the laundering of fiat currency through different banks and bank addresses. However, with cryptocurrency the laundering transactions have the potential to be done in a faster and more efficient manner than through traditional banks. Fraudsters often attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the United States and laundered through cryptocurrency accounts maintained by people and fraudsters outside of the United States.

17.     Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency to another, to attempt to obscure the source of funds and make it more difficult for law enforcement to track illicit funds as they move from one blockchain to another.

## Tether (USDT)

18.     **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

19.     **Tether**: Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens (a stablecoin). In the instant case, at the request of law enforcement, Tether acted voluntarily to freeze/blacklist the USDT

associated with the **Target Addresses** and has indicated that they will continue to do so until they receive the instant warrant.

20.    **USDC:** Circle Internet Financial Limited ("Circle") is a peer-to-peer payments technology company that manages USDC. In the instant case, at the request of law enforcement, Circle would not act voluntarily to freeze/blacklist the USDC associated with the **Target Addresses** and has indicated that they will not do so without a court order.

21.    **Ethereum:** Ethereum is a decentralized, open source blockchain network and software development platform with smart contract functionality. Ether ("ETH") is the native cryptocurrency on the Ethereum platform. In the instant case, the ETH was swapped to USDT and sent to the **Target Addresses.**

### Cyber Enabled Cryptocurrency Investment Fraud Defined

22.    The FBI is investigating a cyber enabled cryptocurrency investment fraud scheme, often colloquially referred to as "pig-butchering." Based on data submitted to the FBI's Internet Crime Complaint Center (located at https://www.ic3.gov/) in 2022 alone, these schemes targeted tens of thousands of victims in the United States and resulted in over two billion dollars in private assets being siphoned overseas. Cyber-enabled cryptocurrency investment fraud schemes begin by criminals contacting potential victims through seemingly misdirected text messages, dating applications, or professional meetup groups. Next, using various means of manipulation, the criminal gains the victim's affection and/or trust.

23.    Once that trust is established, the criminal recommends cryptocurrency investment by touting their own, or an associate's, success in the field. Means of carrying out the scheme vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to

mimic legitimate platforms. The subject assists the victim with opening a cryptocurrency account, often on a legitimate U.S.-based exchange such as Coinbase, and then walks the victim through transferring money from a bank account to that cryptocurrency account. Next, the victim will receive instructions on how to transfer their cryptocurrency assets to the fake investment platform. On its surface, the platform shows lucrative returns, encouraging further investment; underneath, all deposited funds are routed to a cryptocurrency wallet address controlled completely by the criminals. The fraud scheme is typically executed as follows:



24.    Fraudsters frequently allow victims to withdraw some of their "profits" early in the scheme to engender trust and help convince victims of the legitimacy of the platform. As the scheme continues, victims are unable to withdraw their funds and are provided various excuses as to why. For example, the criminals will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by the criminals to elicit more money from victims. Ultimately, victims are locked out of their accounts and lose all their funds.

25.    The cryptocurrency ecosystem is used by criminals not only to receive victim

money, but to launder it quickly, anonymously, and at scale. Like traditional money-laundering, laundering money through cryptocurrency shares the same three stages of placement, layering, and integration, with different techniques applied within each stage:

26.    **Placement** – Criminals use non-custodial, or "private" wallets to initially receive victim funds. This is because such wallets are unattributable to law-enforcement by blockchain analysis alone, are simple to create, and can accept large transaction amounts without additional scrutiny.

27.    **Layering** – Next, criminals will have victim funds transverse numerous private wallets, consolidate with other illegitimate and unknown-origin funds, and be subjected to other more cryptocurrency-specific processes to obfuscate both the origin of, and the ultimate destination for, the victims' funds.

28.    **Integration** – Finally, by using a diffuse network of "brokers," who agree to exchange cryptocurrency for fiat currency using various means, criminals render their proceeds liquid and fully integrated with the legitimate financial system.

## April 2025 Seizure Warrants

29.    In March of 2025, FBI Baltimore learned of multiple victims of a cryptocurrency fraud scheme that closely follows the cryptocurrency fraud patterns identified above. The scheme involved at least three fake investment platforms; the "Angel Dreamer Wealth Society," "Dream Builder Wealth Society," and "Seeds for Wealth," also referred to as "SW Alliance." Victims in the scheme were typically encouraged to join a WhatsApp group message with other 'investors' where a 'Professor' coached the victims on when and how to invest in the schemes. The Professor would provide trade tips, or signals, telling investors when to execute a trade. Based on victim complaints and financial tracing analysis, in April of 2025, the Honorable J. Mark Coulson, and

the Honorable Ajmel Quereshi, U.S. Magistrate Judges for the District of Maryland, signed seizure warrants for USDT and USDC in three virtual currency addresses. These seizure warrants 8:25-mj-821-AAQ, 8:25-mj-822-AAQ, and 1:25-mj-1008-JMC, are hereby incorporated for reference.

30.     The USDC and USDT in these three addresses constituted proceeds of a fraud scheme (as well as funds involved in money laundering), that was perpetrated on victims throughout the country, including N.B., a resident of Hartford County, Maryland, by what the FBI believes to be the same group described below. In sum, the criminal conduct supporting these previous seizure warrants involved networks of fraudsters operating fake investment groups, including the "SW Alliance" group detailed below. The individuals who ran these groups included "Professor Dexter Quisenberry, Melissa Martin, Brian Davis, and Richard Moore," names that are identical or very similar to the below fraudsters' purported names. The fraudsters' operation was also nearly identical – a get rich quick cryptocurrency scheme, followed by unexpected losses, followed by the victim investing more funds, followed by requests for additional payments to cover taxes or withdrawal fees on the victims' fraudulently-represented earnings. As such, your affiant believes the group described below is the same fraud ring that perpetrated the fraud against Maryland victim N.B. in the above warrants.

### Victim P.W.

31.     On May 16, 2025, Victim P.W. submitted an IC3 complaint, reporting a loss of $372,499.92. P.W. was interviewed by FBI Baltimore on February 3, 2026. P.W. is in his fifties and lives in Riverside, California. In December of 2024, P.W. sought investment advice through a "Seeds for Wealth Alliance" Instagram account and was contacted by an individual named Melissa Martin ("Martin"), an administrator for Seeds for Wealth Alliance ("SW Alliance"), with the website www.seedsforwealth.com. P.W. communicated with Martin via WhatsApp and

later Telegram. Martin added P.W. to a WhatsApp group called "SW Alliance VIP E11" where "teachers" provided market news, analysis and trading tips for stocks and options. Some of the individuals were:

     i.   Dexter Quisenberry – Professor

     ii.   Richard Moore – Advisor

     iii.   Brian Davis - Advisor

32.     The name of the WhatsApp group and Telegram group constantly changed based on the type of advice or program P.W. was invited to invest in. Richard Moore and Brian Davis had a competition to see whose strategy made the most amount of money. P.W. communicated with Richard Moore more than Brian Davis. Initially, P.W. traded $5,000 in Tesla options in P.W.'s Merril Lynch account based on the trading signals in the SW Alliance WhatsApp Group. Melissa Martin told P.W. that all losses would be reimbursed via their new cryptocurrency token, SWA, valued at $3 in December 2024. The SWA cryptocurrency token could only be traded on the "RoyHub" investment platform. After P.W. lost $5,000 in TSLA options, P.W. received 1,000 SWA coins in the RoyCoin exchange. Martin directed P.W. to download their app, RoyHub, later renamed "Roy-Top" and "RoyBest". Sometimes the apps would disappear from the app store, so P.W. was provided links to www.pigfenfa.com/Ho9SsPLV and https://h5.roycoin.me.

33.     SW Alliance introduced Professor Quisenberry's AI system which predicted cryptocurrency futures. SW Alliance credited $300 to Roy Wallets for margin trading, and asked investors to return the original amounts and send screenshots of trade entries and exits to help

improve the AI. Later, P.W. transferred $2,464.99 and $8,882.81 in USDT to P.W.'s Roy Wallet to begin investing. P.W.'s balance then grew to a supposed $300,000.

34.    P.W. received an individual message on WhatsApp by an unknown male who claimed to be in a higher SW Alliance Tier than P.W. The unknown male told P.W. that he had received a trading signal on the higher tier that would make P.W. more money. P.W. executed the trade and P.W.'s entire account was wiped out.

35.    SWA then launched an "Alliance Partnership Program", promising over 300% in returns with seven tiers. To enter Tier 1, an investor had to invest at least $50,000. P.W. liquidated investment accounts with Merril Lynch and Charles Schwab to invest the $50,000. P.W. was told that he sent the $50,000 to his own RoyHub account, not the RoyHub account P.W. was instructed to send the funds to. P.W. then sent an additional $50,000 to RoyHub. P.W. funded the $50,000, with a $35,000 loan from a friend and the remaining $15,000 through he and his wife's personal funds.

36.    P.W received daily signals from a Tier 1 chatroom and sent more money to the investment platform. According to the information P.W. could see on the SW Alliance's interface, P.W.'s investment had purportedly made around $250,000 in profits. SW Alliance then introduced "Initial Coin Offerings (ICO)s" through Roy Hub. Over the period of a month, P.W. invested in several ICOs.

37.    After numerous investments, S.W. Alliance's interfaced showed P.W. had a balance of $11 million. SW Alliance told P.W. that P.W. could not withdraw funds until P.W. paid a 1% Tier 7 fee of $100,000. P.W. had to pay the fee from funds outside of SW Alliance,

not profits in P.W.'s investment account. P.W. consulted with P.W.'s personal accountant, who advised P.W. to pay the fee via cashing out IRAs.

38.     The Roy Exchange then claimed that they were merging with another exchange and prompted users to withdraw funds. When P.W. tried to withdraw P.W.'s funds, P.W. was told that P.W. was number 27,000 in the queue. To expedite, P.W. could purchase "VIP status" for $96,000, which was originally discounted from $200,000. P.W. initially declined, but only moved from 27,000 to 24,000. P.W. then paid $96,000 for VIP Status. P.W. funded this through either a loan from P.W.'s accountant's friend, who sent P.W. approximately $60,000 in Bitcoin, or from P.W.'s wife's IRA.

39.     After P.W. paid $96,000, P.W. was told P.W. needed to pay a $30,000 tax deposit. P.W. questioned the platform about this, because P.W. knew that he would pay taxes at the end of the year to the IRS, not RoyHub. When P.W. questioned this, P.W. would get generic responses from RoyHub such as "this is our policy".  Additionally, P.W. could not see the Roy Wallet on the blockchain. The platform told P.W. that blockchain verification only happened after P.W. withdrew funds.

40.     An individual named Charles contacted P.W. via WhatsApp, claiming to be a hacker who found P.W.'s wallet information and ID on Roy's servers. Charles offered to retrieve P.W.'s funds for $100,000. P.W. did not pay because P.W. did not have enough money left. Later, P.W. was contacted on WhatsApp by an individual named Jason James Rex ("Rex") after P.W. tried calling Coinbase security. P.W. believed Rex worked for Coinbase, because P.W. had previously called Coinbase to report the scam and because Rex sent P.W. an image of Rex's "Coinbase employee ID". Rex claimed that he could help retrieve P.W.'s funds from Roy Exchange, if P.W. paid $16,000 to establish a tax basis through a Trust cryptocurrency wallet.

P.W. paid two separate $8,000 transactions via Trust Wallet. The funds were taken out of the Trust Wallet without P.W.'s knowledge or consent. P.W. then contacted Coinbase and discovered Rex was not a Coinbase employee. P.W. has not received any funds from SWA or Rex and has not been contacted by either since May 2025.

**Victim K.G.**

41.    On May 3, 2025, victim K.G. submitted an IC3 complaint claiming a loss of $485,403.03. K.G. was interviewed by FBI Baltimore on February 3, 2026, and on February 9, 2026. K.G. is over sixty years old and is a resident of San Jose, California. K.G. joined a WhatsApp group chat named "DZ Alliance VIP 07" in December of 2024 after seeing @speculators, known as the wolf of wall street, and @ambrialatay, known as Bradford, X accounts. The two X accounts offered advice on buying and selling stocks[1]. The administrator of the group was an individual named Erin Martin ("Martin"). Martin told K.G. to download the CAU-Tool app ("CAU") from the Apple App Store. Each day, the DZ Alliance had two sessions led by Professor Damon Quisenberry ("Professor") and other instructors in the group. Two other teachers in the group were Joshua Davis and Brandon Moore. Each session was about investing, the stock market, and cryptocurrency. Initially CAU added $300 to K.G.'s account as test funds to try trading on the app. K.G. received trade signals on the CAU Telegram App group chat named DZ Alliance Partner. In January 2025, K.G. invested a couple of thousand dollars of his own funds as a test.

42.    K.G. was then introduced to a "Partners Program" with seven levels. To join the first level, an investor needed to invest at least $50,000. In exchange, the investor was promised

---

[1] At the time of the interview, K.G. stated the two X accounts have since been suspended by X.

a 300% return and 30% of the profits. K.G. joined the Partners Program on February 4, 2025, and invested $50,000. K.G. entered a written purported investment contract with DZ Alliance.

43.     Later, K.G. received a message from an individual that K.G. believed to be a part of DZ Alliance who recommended a short signal to K.G. K.G. executed on the short signal and K.G.'s investment account was wiped to zero. K.G. then asked CAU for help after K.G.'s account was decimated. CAU suggested adding $50,000 to his account and CAU would lend double whatever K.G. added. K.G. ultimately added $50,000 to the investment platform and DZ Alliance added $100,000, totaling $150,000 in K.G.'s account. With $150,000 in K.G.'s investment account, K.G. entered level 2 of the Partnership Program. Around this time K.G. received another message with a signal to trade outside of the group message thread. K.G. executed on this signal and K.G.'s account was wiped out again. K.G. asked CAU for help again and the Professor told K.G. that if K.G. added more funds, CAU would add to his account again. K.G. could not remember how much he invested and how much CAU contributed, but K.G.'s investment account reached "level 3," or $200,000.

44.     Subsequently, K.G.'s account was wiped out for the third time after receiving another signal from an unidentified female. After K.G.'s account was wiped out for the third time, K.G. asked CAU for help again. K.G. then took a $100,000 "loan" from DZ's customer service app "C2C," which K.G. paid back.

45.     At this time, K.G.'s account balance was allegedly at $500,000, which allowed K.G. to enter the DZ Alliance's "Green Channel" for "Initial Coin Offers (ICOs)." During the CAU trading period, DZ Alliance required K.G. to purchase the DZA coin with 10% of the profits from CAU.

46.     In mid-March, K.G. was presented with additional ICOs. After a brief period of

investing in ICOs, K.G.'s investment account showed a purported balance of $3.2 million.

47.     On April 13, 2025, the administrator asked K.G. for a 10% fee of the profits, which was $320,000. The administrator told K.G. that the professor had arranged for a special offer for long-term supporters of the Alliance, which they reduced by 50% to $160,000. K.G. then paid the $160,000 service fee.

48.     On April 21, 2025, the Professor announced a supposed merger between DZ Alliance and the trading center C2C, with a deadline to withdraw investment accounts of April 28, 2025, at 9:00 AM EST. The "line" to withdraw funds was said to be very long. K.G. learned of a "VIP status" that would only take thirty minutes to withdraw K.G.'s investment account. K.G. paid $30,000 to gain the VIP status. When K.G. requested the withdrawal, K.G.'s funds were frozen and K.G. would not be able to withdraw the funds unless K.G. paid a 1% tax deposit. K.G. was told the 1% tax deposit was required and would be refunded to K.G. at the end of the year. K.G. paid the tax deposit on April 29, 2025, which was 27 Ethereum cryptocurrency tokens ("ETH"), or approximately $48,000 USD[2]. Following this deposit, K.G. has not heard anything from any of the individuals at the Alliance and has not received any of K.G.'s funds.  K.G. funded K.G.'s investments in DZ Alliance through cashing out K.G.'s IRAs, 401k, Stocks, Cash savings, and borrowing from K.G.'s siblings.

### Tracing of Funds – Originating Addresses

49.     A preliminary financial analysis revealed a pattern of victim funds being sent to two target addresses in ETH, funds being sent to Tokenlon[3] in exchange for USDT, and the USDT being sent to the **Target Addresses**. The two cryptocurrency addresses receiving the victim funds

---

[2] Based on Yahoo Finance historical ETH to USD data (https://finance.yahoo.com/quote/ETH-USD/history/?period1=1745193600&period2=1745971200).

[3] Tokenlon is a decentralized exchange and payment settlement protocol based on blockchain technology. Tokenlon can be used to swap cryptocurrency from one currency to another.

are          0xa27583489410184796b383aB2EE40a1A45C9E63c          ("E63c")          and

0x4BFb27Ca388cB22Bb113DBa5AEC1D1D025E4Cb13          ("Cb13").    E63c    received

approximately 590 ETH or approximately $1.3 million USD, of which approximately 468 ETH or

80% came from four suspected victims. Cb13 received approximately 1,211 ETH or

approximately $2.1 million USD, of which 520 ETH or 45% of the funding came from 8 suspected

victims.

<strong><u>Tracing of P.W.'s Funds</u></strong>

50.    From around December 4, 2024, through May 5, 2025, P.W. sent virtual currency,

valued at approximately $333,000 USD, from his Coinbase account to addresses associated with

the scheme.  Specifically, from March 26, 2025, through April 22, 2025, 85 ETH (approximately

$151,000    USD)    were    sent    from    P.W.'s    Coinbase    account    to    addresses

0x54F562C11e9ce0571E086dba413061E79d64Beea                                          and

0x381988808e86e6e69B1144a540ea46DBA9c0D7ab.    These funds were then sent through a

series of intermediary addresses and commingled with ETH from sources other than P.W.  P.W.'s

funds were eventually sent to the addresses Cb13 and E63c referenced above.  P.W.'s funds were

then exchanged for USDT through Tokenlon, a decentralized exchange, and sent to **Target**

**Addresses** 1 through 10.  The chart below provides an overview of the tracing of the funds:



### Tracing of K.G. Funds

From around January 14, 2025, through May 24, 2025, K.G. sent 342 ETH (approximately $729,000 USD) from his Coinbase account to address 0x657E522BC2A8B26E49f89DA466a650454Ee24Df1. These funds were then sent through a

series of intermediary addresses and commingled with ETH from sources other than K.G. Funds from K.G. were eventually sent to address Cb13. These funds were then exchanged for USDT through Tokenlon, a decentralized exchange, and sent to **Target Addresses** 4 through 10. The chart on the next page provides an overview of the tracing of the funds:



51.    A preliminary analysis of **the target addresses** shows there is a total of approximately 4,189,624.249863 USDT combined across all ten of the target addresses. Based on my training, knowledge, and experience, a cryptocurrency address used for illicit purposes is almost never also used for legitimate purposes.   A cryptocurrency address funded by cyber enabled cryptocurrency investment fraud is either entirely funded with such illicit proceeds, or funded with illicit proceeds and co-mingled with ostensibly clean or untraceable proceeds so as to purposefully obfuscate the illicit nature of the fraud proceeds.

52.    Based on my training, knowledge, and experience, and the specific tracing of the funds fraudulently obtained from victims P.W. and K.G. to the **Target Addresses**, I believe that the funds in the **Target Addresses** are proceeds of fraud.   Further, although your Affiant was unable to trace all the funds located in the **Target Addresses** to additional specific victims, the available tracing of those funds is consistent with this fraud ring's pattern of receiving fraud proceeds and then laundering those proceeds through other cryptocurrency addresses.   For this reason, your Affiant believes the entire balance of the **Target Addresses** is comprised of funds obtained by fraud and subject to seizure.   In addition, even if the source of some of the funds in the **Target Addresses** cannot be conclusively shown, because the **Target Addresses** contains illicit funds combined with other illicit funds as well as unknown funds, and those funds having passed through multiple addresses, your affiant respectfully submits that all funds in the **Target Addresses** are involved in money laundering, and therefore subject to seizure.

## CONCLUSION

53.    This affidavit seeks seizure of the equivalent amount of USDT tokens currently associated with the **Target Addresses**.   Based on my training and experience, I know individuals engaged in fraud often move proceeds of criminal activity through multiple financial addresses,

sometimes at a rapid pace, and often with no discernable legitimate purpose with the goal of concealing the true nature and source of the underlying funds. The tracing in this case demonstrates this; it shows the movement of the victims' funds, broken up and distributed through a series of transactions, without any apparent legitimate economic purpose, which implies the purpose of the transactions was to conceal the nature, source, location, ownership and control of the proceeds. *See*, e.g., *United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995) (convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source).

54.     Based on the forgoing, I submit that there is probable cause to believe the funds held in the **Target Addresses,** in any form, are proceeds of, or traceable to proceeds of wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§1343 and 1349, and/or are involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and therefore subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 28 U.S.C. § 2461(c), and 982(a)(1).

55.     Further, because the requested warrants would be executed by electronic service, I respectfully submit that there is good cause to permit the execution of the warrants at any time, day or night.

**AARON CAPITEL**

Digitally signed by AARON CAPITEL
Date: 2026.03.09 13:16:00 -04'00'

Special Agent Aaron Capitel
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____13th_____ day of March 2026.

The Honorable Charles D. Austin
United States Magistrate Judge